UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Deborah Barclay,                    :
    Plaintiff,                  :
                                    :
v.                                  :
                                    :   Case No. 3:04cv1322 (JBA)
Kim Michalsky, Paula Hughes,        :
Connecticut Valley Hospital,        :
and the Department of Mental        :
Health, State of Connecticut,       :
    Defendants.                 :

RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 63]

Plaintiff instituted this action against her former employer Connecticut Valley Hospital ("CVH"), a division of the State of Connecticut Department of Mental Health and Addiction Services ("DMHAS") (also a defendant), and two of her former supervisors at CVH, Paula Hughes and Kim Michalsky, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., 42 U.S.C. § 1983, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, et seq., claiming gender discrimination and retaliation in violation of the First Amendment of the Constitution.  See Compl. [Doc. # 1]. Defendants moved for summary judgment on all claims, on various grounds, see [Doc. # 63], and plaintiff now appears to have abandoned all claims except her § 1983 First Amendment retaliation claim, having only responded to defendants' arguments regarding this claim in her opposition memorandum.  See Pl. Opp. [Doc. # 75] at 1 ("Inasmuch as there exists genuine issues of

1

material fact as to Barclay's claim of retaliation for the exercise of her First Amendment right to freedom of speech, summary judgment is inappropriate.").

For the reasons discussed herein, defendants' motion will be denied as to plaintiff's § 1983 First Amendment claim.  The motion will be granted as to plaintiff's other claims, as they have been abandoned.[1]  All claims against defendant Hughes are dismissed.

I.    **FACTUAL BACKGROUND**

Plaintiff, a white female, became a licensed practical nurse in 1999 and began working at CVH in 2002 as a charge nurse on the third (night) shift.  Defendant Hughes began employment with the

_____

[1] Although plaintiff has abandoned all claims but her § 1983 claim, the Court nevertheless also notes that defendants' arguments as to these claims may well have been meritorious.  As to plaintiff's Title VII sex discrimination claim, plaintiff did not exhaust her administrative remedies – a precondition to filing suit in federal court (see Francis v. City of N.Y., 235 F.3d 763, 768 (2d Cir. 2000)) – as her charge to the Equal Employment Opportunity Commission only mentioned age and retaliation.  To the extent plaintiff asserts an age discrimination claim (it is not clear whether she does although her complaint references her age and, in its conclusion, claims defendants engaged in age discrimination), age is not a protected class under Title VII and plaintiff does not assert a claim under the Age Discrimination in Employment Act,  29 U.S.C. § 621, et seq.  Lastly, plaintiff's CFEPA claim is barred by the Eleventh Amendment as the State has consented only to suits brought in Connecticut Superior Court.  See Walker v. Conn., 106 F. Supp. 2d 364, 370 (D. Conn. 2000) (Burns, J.) ("The State has waived immunity, but only as to cases brought in the Superior Court.") (citing Conn. Gen. Stat. § 46a-99).  Further, plaintiff's CFEPA claim against the individual defendants must be dismissed because CFEPA "does not impose liability on individual employees." Perodeau v. City of Hartford, 259 Conn. 729, 743 (Conn. 2002).

DMHAS at CVH as a head nurse in 1982 and retired from state service in June 2003, but was subsequently hired for a series of temporary (120-day) contracts, and pursuant to those contracts worked as an R.N. Supervisor in the General Psychiatric Division at CVH from July 2003 to December 2003, August 2004 to November 2004, and June 2005 to July 2005. Defendant Kim Michalsky is a psych-certified psychiatric nurse who has worked at CVH since 1988, eventually obtaining the position of R.N. Supervisor, a position she held during the events relevant to this case.

Plaintiff worked the third shift at CVH in the psychiatric division and defendants Hughes and Michalsky were her supervisors. Beginning in the summer of 2003, certain incidents took place resulting in plaintiff's being disciplined, including being put on administrative leave, and ultimately in May 2004, plaintiff transferred to the State of Connecticut Department of Corrections, Garner Correctional Facility, where she was employed as a nurse in the Medical Unit. Specifically, during that time period plaintiff expressed to her supervisors concerns that other employees on the third shift were using excessive restraints with patients and were sleeping on the job, and suggested that the employees needed more training and additional staff. See Barclay Dep. [Doc. # 74, Ex 1] at 252-53. On July 5, 2003, plaintiff had a conversation with Hughes, during which plaintiff claims Hughes became angry with her because she would not provide in writing

the names of individuals she saw sleeping on duty.  Plaintiff
testified that Hughes also told her "to either quit or be fired"
"because [she] wouldn't shut up and take [her] paycheck, and be
quiet about the restraints and the sleeping on the job."  Barclay
Dep. at 225.  Hughes described the incident as plaintiff
complaining about her staff being "lazy and stupid" and, when
Hughes reminded plaintiff that it was her responsibility as
"unit" or "charge" nurse to insure her staff was alert and that
she was to address or document these events, plaintiff became
loud and angry and threatened Hughes, including saying that she
was going to "break" her or "break [her] in half."  Hughes Aff.
[Doc. # 63-4, Attach.] ¶¶ 14-16.  Hughes gave plaintiff a "verbal
counseling" in response to the incident, but did not have the
authority to impose discipline on plaintiff, and filed an MHAS-20
complaint, alleging that plaintiff was verbally abusive and had
threatened her with physical harm in violation of Work Rule # 22.
Hughes Aff. ¶¶ 21-24, Ex. B (report).  Plaintiff was placed on
administrative leave for a few days while the human resources
department investigated Hughes's complaint, see Pawlak Aff. [Doc.
# 63-4] ¶ 19, and the department ultimately concluded that
plaintiff's conduct violated Work Rule #22, which provides:
"Physical violence, verbal abuse, inappropriate or indecent
conduct and behavior that endangers the safety and welfare of
persons or property is prohibited."  Work Rules, Ex. to Pawlak

4

Aff.  It was determined that the verbal counseling Hughes gave to
Barclay following the incident was sufficient, and no additional
discipline was imposed.  Hughes Aff. ¶ 30.

Subsequently, on September 14, 2003, plaintiff had an
altercation with Michalsky, resulting in Michalsky filing a
complaint against plaintiff for violations of Work Rules # 18
(personal errands, favors between employees and patients
prohibited) and # 22.  Michalsky spoke to plaintiff about
"boundary" issues, after observing plaintiff rubbing the shoulder
of a male patient.  Michalsky Dep. [Doc. # 63-4, Attach.] at 117.
According to Michalsky, plaintiff became angry during this
conversation and subsequently confronted Michalsky in front of
the staff, ordering her to leave.  Id. at 126-27.  Michalsky
testified that she and the staff were concerned about plaintiff's
behavior and if plaintiff had been a man, Michalsky would have
dialed "911."  Id. at 125.  Plaintiff contends, however, that
Michalsky thought she had done a "wonderful" job with the patient
because she did not have to use restraints, id. at 17, 119-20,
and the human resources officer David Pawlak stated, following
investigation of the event, that "there was no evidence that Ms.
Barclay violated patient's boundaries," Pawlak Report [Doc. # 74,
Ex. 7] at 2.  Plaintiff also testified that the people at CVH
"always threw it in [her] face.  'Oh, you're angry because you
have a red face,'" when in fact she suffers from rosacea which

5

causes her face to flush when she drinks coffee, is exposed to
heat, or is under stress.  Barclay Dep. at 333.  Michalsky's
complaint resulted in an investigation, culminating in a two-day
suspension without pay.  Pawlak Aff. ¶¶ 28-29.[2]  Then, on
September 19, 2003, plaintiff was taken off duty as a charge
nurse, which plaintiff characterized as a "demotion," and was
transferred to another unit.  Barclay Dep. at 234-35, 239.

Plaintiff testified that subsequently, in January 2004, she
reported to one of her supervisors that she had received threats
from people whom she had seen use excessive restraints, was
labeled a "whistle blower," and was so afraid to return to her
old unit that she was having chest pains.  Id. at 243-55.  Around
the same time, in January or February 2004, plaintiff was
assigned to engage in "re-training," which she testified was not
training at all, but instead involved being stationed in another
unit without any duties and occasionally handing out lunch or
manning the phones.  Id. at 260-62.  In March, plaintiff was told
that "[they] underst[oo]d that [plaintiff] [wasn't] happy with
[her] education program," and that she was going to be
transferred to work "with the most experienced nurses CVH has,"
and she would be critiqued "based on journals that [she would]

_____

[2] Hughes and Michalsky both testified that they do not have
the authority to discipline, hire, fire, or transfer employees at
CVH, but they can report an employee to the human resources
department for investigation and appropriate discipline.  Hughes
Aff. ¶ 26; Michalsky Dep. at 202, 239.

read or literature," but that she only worked there for "about four hours," before being told "there's been another accident report and [they] ha[d] to figure out what [they were] going to do with [her,]" and told her to "get [her] purse and get out." Id. at 269-70.

At this point plaintiff was put on paid administrative leave, which was detrimental to her career because she was not practicing. Id. at 302. Plaintiff remained on administrative leave until she transferred to a position at the Department of Corrections, and returned to administrative leave upon leaving the Department of Corrections when she was not hired after her four-month test period. Plaintiff testified that while at the Department of Corrections she was threatened by a co-worker there who she feared would physically harm her (plaintiff was "scared stiff . . . scared out of [her] mind"), and she felt she was being targeted. Id. at 281-83, 294. Acknowledging that she was never formally terminated, plaintiff testified that she occasionally received letters threatening termination if she did not report to work, but that she could not get into CVH because her badge had been deactivated. Id. at 299, 303-04. Additionally, she periodically does not receive her pay check, id. at 301, 337-39, and CVH personnel will not return her calls, id. at 303.

Plaintiff seeks compensatory damages, attorneys fees, and

punitive damages.  As described in greater detail below,
defendant disputes plaintiff's ability to succeed on her § 1983
First Amendment retaliation claim, as well as her entitlement to
punitive damages.

## II.  STANDARD

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with affidavits . . . show that there is no genuine
issue as to any material fact and that the moving party is
entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  A party seeking summary judgment "bears the burden of
establishing that no genuine issue of material fact exists and
that the undisputed facts establish [its] right to judgment as a
matter of law."  Rodriguez v. City of N.Y., 72 F.3d 1051, 1060
(2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144,
157 (1970)).  "The duty of the court is to determine whether
there are issues to be tried; in making that determination, the
court is to draw all factual inferences in favor of the party
against whom summary judgment is sought, viewing the factual
assertions in materials such as affidavits, exhibits, and
depositions in the light most favorable to the party opposing the
motion."  Id. (citations omitted).  "If reasonable minds could
differ as to the import of the evidence . . . and if there is any
evidence in the record from any source from which a reasonable

8

inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing

that little or no evidence may be found in support of the
nonmoving party's case.").  The non-moving party, in order to
defeat summary judgment, must then come forward with evidence
that would be sufficient to support a jury verdict in his or her
favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)
("[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.").  In making this determination, the
Court draws all reasonable inferences in the light most favorable
to the party opposing the motion.  Matsushita, 475 U.S. at 587.
However, a party opposing summary judgment "may not rest upon the
mere allegations or denials of the adverse party's pleading,"
Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the
material facts" is insufficient.  Matsushita, 475 U.S. at 586
(citations omitted).

## III. DISCUSSION

### A.   Dismissal of Claims Against Paula Hughes

Fed. R. Civ. P. 4(m) provides that "[i]f service of the
summons and complaint is not made upon a defendant within 120
days after the filing of the complaint, the court, upon motion or
on its own initiative after notice to the plaintiff, shall
dismiss the action without prejudice as to that defendant or
direct that service be effected within a specified time; provided
that if the plaintiff shows good cause for the failure, the court

shall extend the time for service for an appropriate period." Defendants argue that because service was not timely accomplished on Hughes, who has been a North Carolina resident since 2003, any claims against her should be dismissed.[3]  Plaintiff concedes that service was not timely made on Hughes, see Motion to Consolidate [Doc. # 66] ¶ 5, and has filed a separate, virtually identical action, against Hughes, see 3:06cv276 (JBA).

Pursuant to Fed. R. Civ. P. 12(b)(5), an action may be dismissed if the plaintiff fails to serve a copy of the summons and complaint on the defendant(s) pursuant to Rule 4.  See Schaeffer v. Village of Ossining, 58 F.3d 48, 49-50.  "Once validity of service has been challenged, it becomes the plaintiff's burden to prove that service of process was adequate."  See Cole v. Aetna Life & Cas. Ins., 70 F. Supp. 2d 106, 110 (D. Conn. 1999).  Accordingly, because plaintiff acknowledges untimely service of Hughes and has in fact initiated another identical action against Hughes due to untimely service in this action, defendants' motion as to Hughes will be granted.

**B.   Section 1983 First Amendment Retaliation Claim**

Stepping back from the "unchallenged dogma . . . that a public employee has no right to object to conditions placed upon

---

[3] Although defendants' motion is styled one for summary judgment, as to the claims against Hughes the Court construes defendants' motion as one for dismissal due to insufficiency of process pursuant to Fed. R. Civ. P. 12(b)(5).

the terms of employment – including those which restrict the
exercise of constitutional rights," in the past several decades
the Supreme Court "has made clear that public employees do not
surrender all their First Amendment rights by reason of their
employment.  Rather, the First Amendment protects a public
employee's right, in certain circumstances, to speak as a citizen
addressing matters of public concern."  <u>Garcetti v. Ceballos</u>, 126
S. Ct. 1951, 1957 (2006) (citing cases).  "'The problem in any
[such] case . . . is to arrive at a balance between the interests
of the [employee], as a citizen, in commenting upon matters of
public concern and the interest of the State, as an employer, in
promoting the efficiency of the public services it performs
through its employees."  <u>Id</u>. (citing <u>Pickering v. Bd. of Educ. of
Township High School District 205</u>, 391 U.S. 563, 568 (1968)).

Before this balancing test is reached, however, "a court
must be satisfied that a plaintiff claiming First Amendment
retaliation has demonstrated that: (1) his [or her] speech
addressed a matter of public concern, (2) he [or she] suffered an
adverse employment action, and (3) a causal connection existed
between the speech and the adverse employment action so that it
can be said that [plaintiff's] speech was a motivating factor in
the determination."  <u>Mandell v. Cty. of Suffolk</u>, 316 F.3d 368,
382 (2d Cir. 2003).  "If the plaintiff produces evidence of these
three elements, the government may nevertheless escape liability

12

on either one of two separate rationales:" (1) "by demonstrating by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech," or (2) "that plaintiff's speech was likely to disrupt the government's activities and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's speech." Id.  "The inquiry into the protected status of speech [including the so-called Pickering balancing test] is one of law, not fact." Konits v. Valley Stream Cent. High School Dist., 394 F.3d 121, 124 (2d Cir. 2005) ("Whether speech addresses a matter of public concern is a question of law to be determined by the content, form, and context of a given statement, as revealed by the whole record."); Lewis v. Cowen, 165 F.3d 154, 164 (2d Cir. 1999) (magistrate judge erred in submitting the Pickering balancing test to the jury because "[t]he inquiry into the protected status of speech is one of law, not fact").

However, before the Court reaches these issues, it must first address a preliminary question – whether plaintiff expressed her views as a citizen, or as a public employee pursuant to her official duties.  The Supreme Court recently held in Garcetti v. Ceballos, 126 S. Ct. 1951, 1960 (2006), "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their

communications from employer discipline."  Defendants argue that
summary judgment is appropriate in this case in light of
Garcetti.[4]

     Garcetti concerned a deputy district attorney who claimed
retaliation for writing a disposition memorandum in which he
recommended dismissal of a case on the basis of alleged
governmental misconduct.  The Supreme Court held that "Ceballos
did not act as a citizen when he went about conducting his daily
professional activities, such as supervising attorneys,
investigating charges, and preparing filings.  In the same way he
did not speak as a citizen by writing a memo that addressed the
proper disposition of a pending criminal case."  Id.  The Supreme
Court reasoned, "Ceballos wrote his disposition memo because that
is part of what he, as a calendar deputy, was employed to do.  It
is immaterial whether he experienced some personal gratification
from writing the memo; his First Amendment rights do not depend
on his job satisfaction.  The significant point is that the memo
was written pursuant to Cellabos' official duties.  Restricting
speech that owes its existence to a public employee's
professional responsibilities does not infringe any liberties the
employee might have enjoyed as a private citizen.  It simply
reflects the exercise of employer control over what the employer

_____

     [4] The parties addressed the implication of Garcetti v.
Ceballos for this case in supplemental briefing after the opinion
was issued.

itself has commissioned or created." Id.

The Supreme Court distinguished between "[e]mployees who make public statements outside the course of performing their official duties [who] retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government," and "a public employee [who] speaks pursuant to employment responsibilities." Id. at 1961. Accordingly, the Supreme Court limited its holding "only to the expressions an employee makes pursuant to his or her official responsibilities, not to statements or complaints . . . that are made outside the duties of employment." Id. Because there was no dispute that Ceballos' memo had been written pursuant to his employment duties, the Supreme Court did not articulate a "comprehensive framework for defining the scope of an employee's duties," although the majority did reject the dissent's concern that public employers could restrict employees' rights by creating excessively broad job descriptions, directing that "[t]he proper inquiry is a practical one" because "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for

First Amendment purposes." Id. at 1962.[5]

Defendants argue that Garcetti is controlling in this case on the basis that the complaints plaintiff allegedly made to her supervisors regarding employees sleeping on the job and the use of excessive restraints were made pursuant to her official duties because behavior that endangers the safety and welfare of persons is specifically prohibited by Work Rule # 22 and employees have an affirmative duty pursuant to Work Rule # 30 to report violations of existing work rules, policies, procedures, or regulations. That plaintiff's alleged complaints were made in the context of her official responsibilities is supported, defendants contend, by the fact that CVH established an alternative forum (the patient care unit) to which she could address quality of care issues.

Notwithstanding that Work Rule # 30 requires employees to report any rule violations to their supervisors, as Garcetti instructed the inquiry is a practical one, and material issues of fact exist as to whether plaintiff's complaints were made in the context of her job responsibilities. First, as the Supreme Court held in Garcetti, the fact that plaintiff expressed her views at

---

[5] The Court also observed that "[a] public employer that wishes to encourage its employees to voice concerns privately retains the option of instituting internal policies and procedures that are receptive to employee criticism. Giving employees an internal forum for their speech will discourage them from concluding that the safest avenue of expression is to state their views in public." Id. at 1961.

work, rather than publicly, is not dispositive.  126 S. Ct. at
1959 ("Employees in some cases may receive First Amendment
protection for expressions made at work.").  Further, while Work
Rule # 30 imposes a general duty on "all DMHAS employees,"
plaintiff testified that she never received any training about
the work rules or about reports of work rule violations, <u>see</u>
Barclay Dep. at 170, 332, and that when she first started at CVH
she filed a couple of written reports concerning incidents of use
of excessive force and Hughes ripped them up and told her "we
don't do this kind of thing here," <u>id</u>. at 171-73.  Plaintiff also
testified that she "didn't know there was a report to file [for
work rule violations]. . . . I've asked for forms before.  'Is
there a form that needs to be filled out to file a complaint?
No, Deborah.  You just tell me Deborah.'  Paul Hughes told me
that.  Althea Clark told me that.  Everyone told me that." <u>Id</u>.
at 169.  Defendants have not demonstrated that reporting
potential work rule violations relating to patient care was
particularly within the province of plaintiff's professional
duties, more so than that of other DMHAS employees.  Accordingly,
the record does not establish incontrovertibly that plaintiff
made her complaints concerning use of excessive force/restraints
and employees sleeping on duty as part of the discharge of her

duties as a nurse, and <u>Garcetti</u> is not controlling.[6]

Thus, having determined that <u>Garcetti</u> does not extinguish plaintiff's First Amendment rights, the Court turns to the three-prong prima facie case of (1) public concern, (2) adverse employment action, and (3) causal connection, which are addressed in turn.

"Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record."  <u>Lewis</u>, 165 F.3d at 163.  "In reaching this decision, the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."  <u>Id</u>.  Defendants claim that plaintiff's

---

[6] <u>See</u>, <u>e.g.</u>, <u>Batt v. City of Oakland</u>, 02-4975 (MHP), 2006 WL 1980401, at *4 (N.D. Cal. July 13, 2006) (slip op.) (distinguishing <u>Garcetti</u>, noting "defendants' argument that plaintiff had a duty to report misconduct rests on . . . rules and regulations – materials which the <u>Garcetti</u> Court suggested are not dispositive," and finding that notwithstanding such rules and regulations, "the culture of the [Oakland Police Department] and the express commands of [plaintiff's] direct supervisors established that plaintiff had a duty <u>not</u> to report misconduct," and thus "a fact issue remains as to whether plaintiff's speech was protected under the First Amendment"); <u>Kodrea v. City of Kokomo</u>, 04cv1843 (LGM) (WTL), 2006 WL 1750071, at *8-9 (S.D. Ind. June 22, 2006) (slip op.) (distinguishing <u>Garcetti</u> and denying summary judgment, finding factual issues about whether plaintiff's "ordinary job responsibilities" included monitoring or reporting misconduct, such as his reports of two situations of alleged abuse within city government for which he was allegedly terminated, noting that such activity did not appear to be plaintiff's "core function" in his position).

purported complaints related to her job assignments and other
personal grievances, as opposed to matters of public concern, and
that only after plaintiff faced investigations for personal
conflicts and discipline for her outbursts and threats to her co-
workers did she claim to have engaged in conduct protected by the
First Amendment.  Defendants' argument is undercut, however, by
the admission that they criticized plaintiff for refusing to give
the names of people she saw using excessive restraints and/or
sleeping on the job and for not putting her complaints in
writing.  Even without this admission, however, it is not
difficult to conclude that plaintiff's speech concerned a matter
of public concern – the treatment of psychiatric patients at a
state facility and the systems and policies in place to ensure
those patients receive proper treatment and adequate care.
Notwithstanding defendants' arguments, plaintiff's testimony
establishes that she complained about systemic problems –
including scarcity of staff and inadequate training – which she
believed were leading to troubling staff conduct, including
sleeping on duty and excessive use of restraints.  As the Supreme
Court noted in <u>Garcetti</u>, that plaintiff expressed her views to
her supervisors at CVH, rather than in a public forum, does not
strip her speech of First Amendment protection, and the subject
matter of her speech was clearly one of public concern, rather
than a personal grievance regarding working conditions or the

19

like.[7]

Plaintiff identifies several claimed adverse employment actions: discipline/administrative leave, demotion and "re-education" programming, transfer to the Department of Corrections, and constructive discharge.  While defendants do not appear to dispute the majority of these claimed adverse actions, they do contend that it was plaintiff's choice to transfer to the Department of Corrections, and that she was never constructively discharged.  However, "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999).  Indeed, any "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. . . . Otherwise, the

---

[7] See Cygan v. Wisconsin Dep't of Corr., 388 F.3d 1092, 1100 (7th Cir. 2004) (observing that "content is the most important factor" and concluding that plaintiff's expression of her disagreement with her supervisor's decision to start a meal with fewer than ten prison guards on duty touched on matters of public concern, specifically, "internal prison security in a maximum security prison," notwithstanding that plaintiff "could be accurately characterized as a disgruntled employee and her speech may have been partially motivated by her dissatisfaction at [the prison] and by concerns for her person safety"); Catletti v. Rampe, 334 F.3d 225, 230 (2d Cir. 2003) ("The quality of mental health services provided in the County prison is plainly a matter of public concern."); compare Luck v. Mazzone, 52 F.3d 475, 476-77 (2d Cir. 1995) (holding that a communication sent by a former secretary to a radio station complaining of working in non-air-conditioned surroundings concerned an essentially private complaint which was not protected by the First Amendment).

retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection." Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 566 (2002).

Accordingly, defendants' actions in disciplining plaintiff, including suspension without pay, and effectively demoting her by removing her from her charge nurse duty and assigning her to a unit where her only tasks were distributing lunch and answering telephone calls, clearly constitute adverse employment actions. Plaintiff admits that she sought out the transfer to the Department of Corrections and that she was never officially terminated upon her return to CVH. However, reading the summary judgment record in the light most favorable to the plaintiff, although plaintiff instigated her transfer, she did so because she had been stripped of her charge nurse duties, assigned to "re-training" which consisted of performing menial tasks, and had received threats because she was labeled a "whistleblower;" such could be characterized as "constructive transfer." Cf. Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003) ("An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily.").[8]

---

[8] Whether working conditions rise to this level generally depends on two inquiries: "the employer's intentional conduct and the intolerable level of the work conditions." Petrosino v. Bell

Additionally, when plaintiff was transferred back to CVH after her unsuccessful test period at the Department of Corrections, she was again placed on administrative leave, she was unable to access the building, and she was not always paid.  These actions could be found to constitute conduct which would deter a reasonable similarly situated individual from engaging in First Amendment-protected activity and, accordingly, they constitute "adverse employment actions."

As to the third prong requiring a causal connection between the protected conduct and the adverse employment actions, "[t]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment would not have been taken absent the employee's protected speech."  Morris, 196 F.3d at 110 (citing Mount Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287

---

Atlantic, 385 F.3d 210, 229 (2d Cir. 2004).  The first inquiry may be satisfied by proof that "employers acted with the specific intent to prompt employees' resignations," and the second inquiry "is assessed objectively by reference to a reasonable person in the employee's position."  Id. at 229-30.  In this case, defendants' intent can be inferred by the fact that after making her complaints, plaintiff was transferred to another unit supposedly for "re-education," where she had no duties other than mundane tasks, and by Hughes' comment to plaintiff that she could "either quit or be fired."  Barclay Dep. at 225.  The intolerable nature of plaintiff's working conditions could be inferred from, inter alia, the evidence that she received threats from fellow employees serious enough to cause her to experience chest pains and suspect she was having a heart attack.

(1977)).  "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus."  Id. Here, the record contains both types of evidence: direct evidence of retaliatory animus includes that plaintiff's first reports were ripped up and she was told "we don't do this kind of thing here," and she was later told to "shut up and take [her] paycheck, and be quiet about the restraints and the sleeping on the job" and to "quit or be fired."  Barclay Dep. at 225. Retaliation could also be inferred, indirectly, from the fact that the incident reports, discipline of plaintiff, demotion and reassignment, and eventual placement on seemingly permanent administrative leave all directly followed closely in time plaintiff's reporting of her concerns, with the first adverse action (the demotion) following only days after her report to Michalsky.

Thus, plaintiff has adduced evidence sufficient to establish a prima facie case of retaliation, although defendants may still prevail by showing either: (1) that they would have made the same adverse employment decisions notwithstanding plaintiff's protected speech, or (2) that plaintiff's speech was likely to disrupt the government's activities and the likely disruption was sufficient to outweigh the First Amendment value of plaintiff's

23

speech.  Defendants have not demonstrated the absence of any
question of material fact as to either of these two showings.

     While defendants suggest that they would have disciplined
plaintiff, including putting her on administrative leave and
assigning her to "re-education," regardless of the content of her
speech because she was disruptive and had threatened employees,
there is evidence to the contrary.  Specifically, plaintiff
disputes that she ever threatened Hughes or Michalsky.  She
testified that she only yells when someone yells at her first,
and claims that while her face may have been red during the
alleged incidents with Hughes and Michalsky, that was not an
indication of anger, but rather of her rosacea skin condition.
Additionally, the direct evidence of retaliatory animus suggests
that plaintiff would not have been fired but for her comments, in
that she was told not to file written reports documenting her
complaints, and was told to "shut up and take [her] paycheck, and
be quiet about the restraints and the sleeping on the job."
Barclay Dep. at 225.  As to the Pickering balancing, defendants
have not established a likelihood of disruption sufficient to
outweigh the First Amendment value of plaintiff's speech.  While
defendants claim that plaintiff's behavior was disruptive, both
of the alleged incidents with Hughes and Michalsky appear from
the record to have taken place in private.  Additionally,
although defendants contend that after the Michalsky incident

plaintiff berated Michalsky in front of other staff, plaintiff
disputes this contention.  Further, in invoking Garcetti,
defendants claim to encourage reporting of violations of the work
rules, which would include excessive use of restraints and
sleeping on the job, which claim is inherently contrary to their
contention that such conduct has a disruptive workplace effect
sufficient to justify the adverse actions taken.

Accordingly, material issues of fact remain as to whether
plaintiff's speech was made as part of her professional duties,
plaintiff has adduced evidence sufficient to establish a prima
facie case of retaliation, and defendants have not demonstrated
an absence of any disputed issue of material fact as to whether
the claimed retaliation was otherwise warranted, and thus their
motion on this claim will be denied.

### C.  Qualified Immunity

Defendants also move for summary judgment as to the § 1983
claim against the individual defendants on qualified immunity
grounds.  As the claims against Hughes have already been
dismissed, see supra Pt. III.A., the Court decides this issue as
to defendant Michalsky only.

"The qualified immunity doctrine shields 'government
officials performing discretionary functions . . . from liability
for civil damages insofar as their conduct does not violate
clearly established statutory or constitutional rights of which a

25

reasonable person would have known.'"   <u>Lewis</u>, 165 F.3d at 166
(quoting <u>Hawlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).
"Whether an official protected by qualified immunity may be held
personally liable for an allegedly unlawful official action
generally turns on the objective legal reasonableness of the
action assessed in light of the legal rules that were clearly
established at the time it was taken."   <u>Id</u>. (citing <u>Anderson v.</u>
<u>Creighton</u>, 483 U.S. 635, 639 (1987)).   In the case of a § 1983
First Amendment retaliation claim such as this one, "[t]he
relevant inquiry is not whether the defendants should have known
that there was a federal right, in the abstract, to 'freedom of
speech," but whether the defendants should have known that the
specific actions complained of violated the plaintiff's freedom
of speech.   Such an inquiry requires that a court define the
constitutional right with some specificity.   If the right is
defined too broadly, plaintiffs would be able to convert the rule
of qualified immunity . . . into a rule of virtually unqualified
liability simply by alleging violation of extremely abstract
rights."   <u>Id</u>.

In this case, the qualified immunity question is thus
whether Michalsky should have known that the adverse actions she
allegedly took against plaintiff for reporting concerns about the
quality of patient care would violate the First Amendment.   As
noted above, however, Michalsky did not have the power to

discipline, transfer, or fire plaintiff.  Indeed, the only
negative conduct Michalsky is alleged to have engaged in is the
filing of a work rule violation complaint against plaintiff.  The
inquiry thus becomes whether Michalsky should have known that
filing a complaint allegedly in retaliation for plaintiff's
protected speech would violate the First Amendment.

Plaintiff has adduced evidence that she made multiple
complaints to her supervisors about the use of excessive
restraints and staff members sleeping on the job, Barclay Dep. at
252-53, and Michalsky was one of plaintiff's supervisors.
Michalsky corroborates plaintiff's claim because she admits that
she received complaints about staff members sleeping on the job.
Michalsky Dep. at 139-40.  Thus, notwithstanding Michalsky's
claim that she filed the complaint because plaintiff engaged in
improper behavior with a patient and reacted inappropriately when
confronted, reading the evidence in the light most favorable to
plaintiff, there is evidence in the record supporting an
inference that Michalsky filed a work rule violation complaint
against plaintiff as a result of plaintiff's protected conduct.
Further, it should have been apparent to a reasonable person in
Michalsky's position, particularly given that the work rules
actually <u>require</u> individuals to report violations including
safety issues, that punishing plaintiff with a work rule
violation complaint for expressing her concerns about certain

27

systemic and unsafe conditions in the department would be retaliatory and thus violative of the First Amendment.

Accordingly, defendants' motion for summary judgment as to the § 1983 claim against Michalsky will also be denied.  The issue of qualified immunity may be revisited in Rule 50 motions on the basis of the full trial record.

### D.   Punitive Damages

While plaintiff conceives of defendants' motion on punitive damages as encompassing all of plaintiff's claims, the motion appears directed only to the ability to recover punitive damages on a claim under the CFEPA, which claim has been dismissed.  See Def. Mem. at 39 ("CFEPA Does Not Authorize An Award Of Punitive Damages").  Moreover, it is well settled that "[p]unitive damages may be awarded in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 121 (2d Cir. 2006) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  The record discloses issues of material fact on the issue of defendants' motivation. Thus, to the extent defendants sought summary judgment on the punitive damages prayer for relief as to plaintiff's § 1983 claim, it is denied.

**IV.   CONCLUSION**

For the foregoing reasons, defendants' Motion for Summary Judgment [Doc. # 63] is DENIED in part as to plaintiff's § 1983 First Amendment Retaliation claim, and related prayer for punitive damages, and GRANTED in part as to all other claims. All claims against defendant Hughes are dismissed.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 12th day of September, 2006.**