UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Deborah Barclay, | : |
|     Plaintiff, | : |
| | : |
| v. | :   Case No. 3:04cv1322 (JBA) |
| | : |
| Kim Michalsky, Paula Hughes, | : |
|     Defendants. | : |

**RULING ON MOTION FOR SUMMARY JUDGMENT AND
MOTION TO DISMISS FOR FAILURE TO COMPLY WITH COURT'S ORDER
[DOCS. ## 118, 119]**

This action is the consolidation of two separate actions brought by plaintiff Deborah Barclay against, inter alia, two of her former supervisors at the Connecticut Valley Hospital ("CVH"), a division of the State of Connecticut Department of Mental Health and Addiction Services ("DMHAS"), Paula Hughes and Kim Michalsky. Familiarity with the procedural and factual backdrop of this case, including as set out in the Court's previous Ruling on Defendants' Motion for Summary Judgment, see First Summary Judgment Ruling [Doc. # 88], is presumed. The nature of plaintiff's case has been narrowed to a claim brought pursuant to 42 U.S.C. § 1983 alleging retaliation in violation of the First Amendment of the Constitution. This claim as against defendant Michalsky earlier survived summary judgment, see id., and, due to the timing of consolidation, defendant Hughes now attacks the substance of plaintiff's claim against her in a second Motion for Summary Judgment [Doc. # 119].

1

Specifically, Hughes argues that plaintiff's claim is barred by the rule pronounced by the Supreme Court in Garcetti v. Ceballos, 126 S. Ct. 1951, 1960 (2006), "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline," that plaintiff's purported complaints did not concern a matter of public concern, that Hughes was not involved in any adverse employment action claimed to have been sustained by plaintiff, that there is insufficient evidence of a causal relationship between plaintiff's claimed protected activity and any action taken by Hughes, and that Hughes is entitled to qualified immunity. See id. For the reasons that follow, the Court finds persuasive Hughes' contention that Garcetti bars plaintiff's claim here and Hughes' Motion for Summary Judgment will thus be granted on this basis. This determination also supercedes the Court's earlier conclusion, in adjudicating defendants' first summary judgment motion, that Garcetti did not bar plaintiff's claim as against defendant Michalsky, and the Court thus reconsiders that determination, and alters its First Summary Judgment Ruling accordingly.

**I.  Factual Background**

Familiarity with the factual underpinning of this action as

detailed in the Court's First Summary Judgment Ruling is presumed. In brief, plaintiff became a licensed practical nurse in 1999 and began working at CVH in 2002 as a charge nurse on the third (night) shift. This position entailed at least some management/supervisory responsibilities. During the time period relevant to this action, plaintiff worked the third shift in the psychiatric division at CVH and defendants Hughes and Michalsky (among others) were her supervisors. Beginning in the summer of 2003, certain incidents took place resulting in reports being filed against plaintiff, plaintiff being disciplined (including being put on administrative leave), and ultimately in May 2004, plaintiff transferred to a nurse position in the Medical Unit at the Connecticut Department of Corrections' Garner Correctional Facility. Plaintiff contends that during this time period, she engaged in protected activity in the form of expressing concern to her supervisors that her employees on the third shift were using excessive restraints with patients and were sleeping on the job, and she suggested that the employees needed more training and that CVH should hire additional staff.

Specifically in relation to Hughes, as detailed in the Court's previous Ruling, on July 5, 2003 plaintiff had an altercation with Hughes during which she claims Hughes became angry with her because she would not provide in writing the names of individuals she had observed sleeping on duty. While

plaintiff testified that Hughes told her "to either quit or be fired" "because [she] wouldn't shut up and take [her] paycheck, and be quiet about the restraints and the sleeping on the job," 10/27/05 Barclay Dep. at 225, Hughes characterized the incident as plaintiff complaining about her staff being "lazy and stupid" and testified that when she reminded plaintiff that it was her responsibility as the "unit" or "charge" nurse to insure her staff was alert, plaintiff became loud and angry, swore, and threatened Hughes, Hughes Aff. ¶¶ 14-16.  According to Hughes, other employees witnessed the incident and complained about it. Hughes filed a work rule violation complaint against plaintiff related to the incident (for violation of Work Rule #22, providing "Physical violence, verbal abuse, inappropriate or indecent conduct and behavior that endangers the safety and welfare of persons or property is prohibited"), plaintiff was placed on administrative leave while the report was investigated, and ultimately it was determined that Hughes' "verbal counseling" of plaintiff following the incident was a sufficient response. While the other incidents and purported discipline/adverse employment actions claimed by plaintiff do not appear to involve Hughes, the alleged protected activity is the same with respect to all of these events – plaintiff's reporting of sleeping on the job and of the use of excessive restraints on patients.

**II. Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). The duty of the court is to determine whether there are issues to be tried and, in making that determination, the Court must draw all factual inferences in favor of the party opposing the motion, viewing the factual disputes among materials such as affidavits, exhibits, and depositions in the light most favorable to that party. Phaneuf v. Fraikin, 448 F.3d 591, 595 (2d Cir. 2006). "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving

5

party, there is no genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" <u>Parker v. Sony Pictures Entm't, Inc.</u>, 260 F.3d 100, 111 (2d Cir. 2001) (quoting <u>Celotex</u>, 477 U.S. at 324); <u>see also</u> <u>Gallo v. Prudential Residential Servs. Ltd. P'ship</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986) ("[T]here is no issue for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party."). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. Id. at 586 (citations omitted).

**III. Discussion**

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 126 S. Ct. 1951, 1957 (2006). However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Id. at 1960. Accordingly, as set out in the Court's First Summary Judgment Ruling, before the Court reaches the so-called Pickering-balancing test applicable to public employees claiming violation of their First Amendment rights, or assesses the sufficiency of a plaintiff's prima facie case, see Mandell v. Cty. of Suffolk, 316 F.3d 368, 382 (2d Cir. 2003), the first determination to be made

7

is whether plaintiff engaged in the purported protected activity as a citizen, or in the course of her job responsibilities, as "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities," Garcetti, 126 S. Ct. at 1961.

As detailed more thoroughly in the Court's previous Ruling, the rationale of Garcetti is that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." Id. at 1960. Garcetti thus distinguished between "[e]mployees who make public statements outside the course of performing their official duties [who] retain some possibility of First Amendment protect because that is the kind of activity engaged in by citizens who do not work for the government," and "a public employee [who] speaks pursuant to employment responsibilities." Id. at 1961. The inquiry is a "practical one," not solely dependent on the forum for the protected activity (i.e. public or private) or on an explicit job description. See id. at 1959, 1961-62.

In the Court's previous Ruling, issued shortly after Garcetti was decided, it found a genuine dispute of fact as to whether plaintiff's complaints here were made in the context of

8

her job responsibilities at CVH/DMHAS. The Court recognized that plaintiff's complaints regarding use of excessive restraints on patients and employees sleeping on the job concerned behavior that endangered the safety and welfare of patients and was thus conduct specifically prohibited by Work Rule #22, and that all CVH/DMHAS employees have a duty pursuant to Work Rule #30 to report violations of existing work rules, policies, procedures, or regulations; CVH even established a patient care unit to receive and investigate patient care issues. However, the Court also relied on plaintiff's testimony that, notwithstanding Work Rule #30's imposition of a general duty on all CVH/DMHAS employees, she never received any training about the work rules or about reporting work rule violations, and that when she first started she filed a couple of written reports concerning incidents of use of excessive force and Hughes ripped them up, telling her not to fill out a form but just to complain to Hughes. On the basis of this evidence, the Court concluded that defendants had "not demonstrated that reporting potential work rule violations relating to patient care was particularly within the province of plaintiff's professional duties, more so than that of other DMHAS employees. Accordingly, the record does not establish incontrovertibly that plaintiff made her complaints concerning use of excessive force/restraints and employees sleeping on duty as part of the discharge of her duties as a

9

nurse, and Garcetti is not controlling." First Summary Judgment Ruling at 17-18.

Now having the opportunity to reconsider this issue in adjudicating defendant Hughes' Motion for Summary Judgment, and with the benefit of Garcetti progeny from the past year, the Court concludes that its previous interpretation of the scope of Garcetti was too restrictive. While the assessment in this case may be slightly less obvious than in Garcetti – where the plaintiff, a deputy district attorney, claimed retaliation for writing a disposition memorandum in which he recommended dismissal of a case on the basis of alleged governmental misconduct and the Supreme Court found that writing the memorandum was part of what the plaintiff, as a "calendar deputy," was employed to do – cases decided in this Circuit post-Garcetti are instructive in their broader interpretation of the reach of Garcetti.

For example, in Jackson v. Jimino, No. 03cv722, 2007 WL 189311 (N.D.N.Y. Jan. 19, 2007), the court held that the retaliation claim of plaintiff – the former County Director of Real Property Tax Services – was barred by Garcetti, finding that the protected activity claimed – the drafting of letters and memoranda to the County Executive, County Attorney, and others pronouncing "his opinion regarding the passage of Local Law No. 6, which changed the dynamics of his statutory duties, [as]

inconsistent with the New York Real Property Tax Law" – "pertained to issues directly affecting the performance of his duties . . . [e]ven though there was no mention in the statute that [p]laintiff was to provide and/or send any reports, memoranda, or letters of concern or dissatisfaction on matters that were pertinent to his official duties," reasoning "as the Director, it would seem logical that if a problem arose in the course of performing his duties prescribed by statute, [p]laintiff would have to inform either the county executive or legislature." Id. at *10-11. Pagani v. Meriden, 05cv1115 (JCH), 2006 WL 3791405 (D. Conn. Dec. 19, 2006), granted summary judgment to defendants on a teacher's retaliation claim for reporting another teacher's conduct to Connecticut Department of Children and Families, notwithstanding that plaintiff's supervisor had advised him against reporting the incident, finding that "[w]hen making the report to DCF, [plaintiff] understood he was doing so because, as an educator, he had a duty to do so," also observing that "[s]chool teachers are mandated by Connecticut law to report incidents of child abuse to DCF." Id. at *4. In Sweeney v. Leone, No. 05cv871 (PCD), 2006 WL 2246372 (D. Conn. July 31, 2006), a dispatcher working within the Communications Division of the City of Bristol's police department who also provided assurance/quality instruction and review for the department claimed that he had been retaliated

11

against for, on a particularly busy day, making two calls to supervisory police officers requesting extra assistance in the dispatch center. Sweeney granted summary judgment to defendants on this claim finding that "[t]he context and content of [p]laintiff's requests clearly demonstrate that they were work requests made pursuant to official departmental policy, following the Chief of Police's November 29 e-mail" and that "[plaintiff's] requests for assistance related to his 'daily professional activities,' which included ensuring that all incoming calls to the dispatch center were answered." Id. at *9.

Thus, keeping in mind the rationale of these cases in considering the Garcetti issue as applied to the facts in the record here, Work Rule #22 prohibits behavior that endangers the safety and welfare of patients (staff sleeping on duty and using excessive restraints clearly falling into this description), and plaintiff had an affirmative duty pursuant to Work Rule #30, and particularly given her position as "charge" or "unit" nurse, to report violations of work rules (including Work Rule #22). See also Cioffi Aff. (DMHAS Labor Relations Director, former Human Resources Director) ¶¶ 14-15; Pawlak Aff. (CVH Human Resource Officer) ¶¶ 36-38. Although, as the Court previously recognized, plaintiff testified that she never received any training about reporting work rule violations and that Hughes ripped up early written reports she wrote and told her "we don't do this kind of

12

thing here" (similar to what the plaintiff's supervisor told him in Pagani, supra), plaintiff also stated that Hughes, among others, did instruct her to report the violations verbally to her supervisors. Indeed, in her initial memorandum regarding the impact of Garcetti, plaintiff acknowledged that she "may have had a general professional responsibility to complain about mistreatment of patients and sleeping while on duty." Pl. Garcetti Mem. [Doc. # 79-2] at 2 (but contending that "this general requirement to report is most akin to a citizen's right to speak").

Plaintiff's claimed protected activity does not fall outside the scope of this responsibility and, as Garcetti held, "the First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." 126 S. Ct. at 1961 (also stating, "[o]ur precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job"). Specifically, the claimed protected activity, in the form of complaints/reports to her supervisors, informed those supervisors of improper/excessive use of restraints by her staff on patients, stemming (she suspected) from inadequate training, and of staff sleeping on the job. See 2/10/07 Barclay Dep. at 151-54; 10/27/05 Barclay Dep. at 171-74,

13

179, 182, 187, 253.[1] The fact that Barclay also claims to have made suggestions about how to remedy these problems – such as providing additional training and hiring more staff – does not take her activity outside the scope of her professional responsibilities as charge nurse and DMHAS employee. As plaintiff testified at deposition, with respect to her "report[s]," "I did my duty. I did my job. . . . And I wasn't a whistleblower. I did my job." 10/27/05 Barclay Dep. at 323; see also, e.g., Hughes Aff. ¶¶ 14-16 (it was Barclay's responsibility as the "unit" or "charge" nurse to insure her staff was alert).[2]

At oral argument on June 22, 2007, counsel for plaintiff represented to the Court that plaintiff threatened defendants that she would go to the press with her complaints, and that these threats take plaintiff's conduct outside the scope of her official duties and the Garcetti bar. After reviewing the

---

[1] Plaintiff also referred in her October 2005 deposition to a complaint about "certain work being identified for male versus female," id. at 187, but she does not appear to be pressing a Title VII retaliation claim.

[2] Plaintiff's contention in her supplemental submission [Doc. # 134] that while defendants Michalsky and Hughes were "supervisors" tasked with the "responsibility to recognize violations of work rules, clinical policies, human resources policies and procedures or State or federal regulations or mandates," she was a "charge" nurse and "would have been discipline[d] for this [type of conduct] as falling outside of her job description," plaintiff admits that she was a "charge" nurse, and she cannot dispute that she, like other DMHAS employees, had an affirmative duty to report work rule violations and that she had also been specifically instructed to do so verbally, see supra.

14

record, however, including the record references contained in the parties' supplemental submissions made at the Court's request, there is no evidence to support counsel's contention that plaintiff actually communicated to either defendant any intention to go to the press with her complaints.  The deposition testimony counsel referred to at oral argument, rather than indicating that plaintiff communicated any such intention, instead only constitutes plaintiff's characterization of what she believed defendants were thinking, see 2/1/07 Dep. at 151-52 ("If that first MHAS20 wasn't written, I wouldn't be sitting here today, because I was labeled a whistle blower who came forward who saw problems with people sleeping on the job, who saw problems with excessive use of restraints, and excessive force during restraints, so I was labeled for some reason to be a whistle blower, that I was going to go to the press and blow the lid off of everything, and I was just trying to get things corrected."); id. at 190 ("[T]hey felt obviously threatened in some way, because I was labeled a whistle blower, and they were concerned that I would go to the press and report them for being, for allowing sleeping on the job and excessive restraints); this testimony would thus not support a reasonable jury conclusion that plaintiff actually told either defendant anything about

going to the press.[3]  Moreover, it is undisputed that plaintiff did not go to the press (at least not before the adverse employment actions complained of in this action), and that all of her purported complaints were made privately and internally, rather than publicly.  This fact, while not determinative, lends further support to the conclusion that plaintiff acted, as she testified she did, pursuant to her official duties.[4]

While this Court appreciates the logic of Justice Souter's dissent opinion in Garcetti, that "[t]he need for a [Pickering] balance hardly disappears when an employee speaks on matters his job requires him to address; rather, it seems obvious that the individual and public value of such speech is no less, and may well be greater, when the employee speaks pursuant to his duties in addressing a subject he knows intimately for the very reason that it falls within his duties," 126 S. Ct. at 1965, and the frustration the Garcetti doctrine will impart on public employees such as Ms. Barclay, the Court is constrained to follow the

---

[3] In her supplemental submission, plaintiff also refers to her EEOC Charge dated November 12, 2003, attached to the briefing on the first motion for summary judgment, see [Doc. # 75, Ex. 3], and to her September 23, 2003 letter to the EEOC, see [Doc. # 75, Ex. 4].  Neither of these documents makes any mention of the press or threats to go to the press.

[4] While Justice Stevens in his dissent in Garcetti stated that "it seems perverse to fashion a new rule that provides employees with an incentive to voice their concerns publicly before talking frankly to their superiors," 126 S. Ct. at 1963, it nevertheless appears from the majority opinion that speaking publicly may be the only insurance against a Garcetti bar.

16

majority opinion in Garcetti.[5]

Thus, plaintiff was required as part of her professional responsibility as DMHAS employee and charge nurse to report the Work Rule violations she suspected and that responsibility encompasses all of the protected activity she claims; the fact that other DMHAS employees may have shared this professional obligation does not change the outcome of the Garcetti analysis.[6] See also Battle v. Bd. of Regents for the State of Ga., 468 F.3d 755, 761 (11th Cir. 2006) (speech of plaintiff employee in State University's financial aid office in reporting inaccuracies and signs of fraud in student files was made pursuant to her official responsibilities where plaintiff "admitted that she had a clear employment duty to ensure the accuracy and completeness of student files as well as to report any mismanagement or fraud she encountered in the . . . files" and applicable employment guidelines "require[d] all financial aid workers to report suspected fraud"); Mills v. City of Evansville, 452 F.3d 646,

---

[5] As should be obvious from this ruling, this determination concerns the issue of whether plaintiff's conduct is protectable under the First Amendment, but does not constitute any judgment concerning plaintiff's rights under her union contract, which the Court understands is the subject of a pending arbitration.

[6] While Justice Souter in his dissent in Garcetti articulated a concern about "moves by government employers to expand stated job descriptions to include more official duties and so exclude even some currently protectable speech from First Amendment purview," 126 S. Ct. at 1965 n.2, that concern is not implicated here where the work rules applicable in this case were drafted and implemented before Garcetti was decided.

17

647-48 (7th Cir. 2006) (plaintiff police sergeant's retaliation claim barred where plaintiff had told other officers that her supervisor's plan "would not work," as plaintiff "was on duty, in uniform, and engaged in discussion with her superiors, all of whom had just emerged from [her supervisor's] briefing," concluding "[s]he spoke in her capacity as a public employee contributing to the formation and execution of official policy"); Benvenisti v. City of N.Y., 04civ3166 (JGK), 2006 WL 2777274, at *2-3, 9 (S.D.N.Y. Sept. 23, 2006) (complaints about subordinate's job performance by plaintiff computer operations manager "responsible for managing the City's information security" were made pursuant to his "official duties," reasoning that "[a]s a manager, the plaintiff was responsible for supervising his employees and ensuring the productive operation of his unit," observing that his "complaints all focused on the impact of [the subordinate's] employment on [the Department], its effect on office morale and the unit's financial resources, performance, and operation," and concluding that "[i]n sum, the plaintiff's complaints to his supervisors involved precisely the sorts of internal office affairs and employment matters that the plaintiff – as a manager and supervisor – had a duty to address").

**IV. Conclusion**

Thus, because plaintiff would be unable to demonstrate at trial that she engaged in the claimed protected activity as a

18

"citizen" for First Amendment purposes, but rather the evidence shows she did so as a public employee speaking in the "course of performing [her] official duties . . . pursuant to employment responsibilities," Garcetti, 126 S. Ct. at 1961, her First Amendment retaliation claim against both defendants Hughes and Michalsky cannot survive.[7] Accordingly, defendant Hughes' Motion for Summary Judgment [Doc. # 119] is GRANTED, defendants' joint Motion to Dismiss for Failure to Comply with Court's Order [Doc. # 118] is DENIED as moot, and the Clerk is directed to enter judgment IN FAVOR OF BOTH DEFENDANTS on plaintiff's remaining First Amendment retaliation claim and to CLOSE this case.

                     IT IS SO ORDERED.

                              /s/
                      Janet Bond Arterton
                      United States District Judge

**Dated at New Haven, Connecticut this 27th day of June, 2007.**

---

[7] There is no relevant difference reflected in the record with respect to the nature of the claimed protected activity vis-a-vis Michalsky and Hughes, respectively, justifying different Garcetti treatment between the two, notwithstanding the parties' discussions at oral argument about the fact that plaintiff's complaints to each were made separately and at different times during her employment at CVH.